UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANKLIN INOJOSA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 20 C 1114 |
| ) | |
| BOARD OF TRUSTEES OF THE CITY ) | |
| COLLEGES OF CHICAGO, ) | |
| COMMUNITY COLLEGE DISTRICT 508, ) | |
| a municipal corporation, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter is before the Court on Defendant Board of Trustees of the City College of Chicago, Community College District 508's ("CCC") Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the following reasons, the Motion is granted.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

Plaintiff Franklin Inojosa is a full-time professor in the Department of World Languages and English Language Learning (the "Department") at Harold Washington College ("HWC"), one of the seven colleges in the CCC system. Inojosa has worked as a CCC professor since 2002 and has held the rank of full professor at HWC since 2010. Inojosa's primary discipline is Spanish, though he is also credentialed in music and humanities.

As a full-time faculty member, Inojosa is covered by a collective bargaining agreement ("CBA") between CCC and the Cook County Teachers Union, Local 1600 AFT, AFL-CIO ("Local 1600"). Pursuant to the CBA, full-time faculty members, except those who teach English Composition, are required to have a course load of 15 hours per semester. English Composition faculty need only 12 hours per semester. English Language Learning ("ELL") professors fall in the category of English Composition faculty and therefore have a course load of 12 hours per semester.

The Department consists of five other full-time professors—four females and one male. The Department's female professors are all ELL professors. Inojosa and the other male professor in the Department are not ELL professors. One professor, Gabriela Cambiasso, was hired as an ELL professor and was subsequently credentialed in Spanish. Cambiasso was hired after Inojosa and has less seniority.

From 2010 through 2020, the order of seniority in HWC's Spanish discipline was as follows: (1) Johanny Vazquez; (2) Margarita Chavez; (3) Inojosa; and (4) Gabriela Cambiasso. Professor Vazquez retired in 2020, after which Professor Chavez became

2

the most senior. Professor Chavez retired in 2022. Professors Vazquez and Chavez only taught Spanish and were not certified to teach ELL.

Full-time faculty make their fall and spring course load selections by seniority, and overtime by rotation points, in a process defined in the CBA and colloquially known as "round robin." Under this process, professors first fulfill their course obligations inside their department and only then teach courses outside their department when there are no remaining intra-departmental courses. In 2010, Inojosa taught courses outside of the Department and accordingly did not receive courses based on either the seniority or the round robin process. In 2018, Inojosa requested he be able to fill his entire course load in the Department. He has not always been able to do so. Inojosa has also, on occasion, not been allowed to select available computer classrooms for online courses as other faculty members have.

When the position of World Languages academic online coordinator ("AOC") became available, Inojosa nominated himself for the position. The AOC coordinates Spanish and French online assignments district-wide at CCC, and the position was first opened to HWC full-time faculty. The AOC position results in a three-credit hour reduction in the professor's required teaching load. Cambiasso also applied for the position and was elected by a Department vote in which all members of the Department voted for Cambiasso, with the exception of Inojosa. With her new position as AOC and existing status as an ELL professor, Cambiasso's required teaching load was reduced to nine hours a semester.

Inojosa asserts that, before her retirement, Professor Vasquez received special accommodation in several semesters where one of her courses was in danger of being cancelled due to low enrollment and Professor Chavez enrolled in those courses to prevent cancellation. Inojosa never received such an accommodation. CCC disputes this claim. Additionally, Inojosa was never able to teach the course "Spanish 111 for Heritage Learners" on Monday and Wednesday because Professor Vasquez—who had greater seniority than Inojosa—also taught the course at those times. As a result, Inojosa had to offer the class on Tuesdays and Thursdays, which he believes was a less favorable schedule and subject to a greater risk of cancellation.

According to Inojosa, "[a]lone among the faculty in the Department, Inojosa has neither a photo nor a blurb describing his background or areas of expertise on the Department's website . . . [the female faculty members] are each depicted with smiling, welcoming photos and [blurbs] about their backgrounds and personal interests." Dkt. # 67, at 9. Inojosa says that to the extent students choose professors based on their review of the Department website, his lack of recognition on the website is a disincentive for students to opt for his sections, thus putting his sections at risk for cancellation and requiring Inojosa to fulfill his teaching requirements in other departments. Inojosa also complained that his seniority was violated because courses did not appear in sequential order on CCC's district-wide system utilized by students during the course selection process.

4

In the fall of 2019, Inojosa was not given certain classes after a higher seniority faculty member went on sabbatical. The classes were cancelled instead of being given to Inojosa. Inojosa also states there have been multiple instances when his classes have been cancelled, thus forcing him to scramble and fill his course load at the last minute. There is no set process for determining class cancellations; it varies from semester to semester. Classes can be cancelled due to inadequate enrollment. Classes are cancelled across the district and is something that affects multiple professors. While the department chair has some say in whether or not a class should be cancelled, the administration has final authority. And when a class is cancelled, the CBA provides that the assigned professor may make load by selecting a different class or taking a semester with a variable load.

In the spring of 2020, Inojosa and another professor, Professor Maritza Cordero, received courses previously assigned to a professor who was placed on administrative leave. Inojosa and Cordero were both paid at the overtime rate defined in the CBA, although Inojosa believed he should have received substitute pay. Faculty members who substitute are compensated at 50% of their regular base pay. The pay rate for overtime assignments for a faculty member is 30% of a pro-rata portion of their base rate of pay. Local 1600 filed a grievance on behalf of the two professors over the issue of overtime pay versus substitute pay, but the grievance was ultimately withdrawn.

Despite Inojosa's complaints regarding the round robin process, Inojosa has been able to make his course load every semester and regularly has overtime. No union

5

grievances have been filed regarding the round robin process, Inojosa's class cancellations, or Inojosa's classroom selections. Inojosa also admits that no one at CCC has discriminated against him because of his sex, race, national origin, or age "in front of" him. In 2019, Inojosa filed a discrimination complaint with CCC's EEO Office, and subsequently filed a charge of discrimination with the EEOC.

In his Complaint, Inojosa claims: (1) national origin discrimination prohibited by Title VII, 42 U.S.C. § 2000e-2 (Count I); (2) race/color discrimination prohibited by Title VII, (Count II); (3) age discrimination prohibited by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (Count III); (4) discrimination prohibited by Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq (Count IV); (5) sex discrimination prohibited by Title VII (Count V); and (6) retaliation prohibited by Title VII (Count VI). CCC now moves for summary judgment on each claim.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other

7

materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

**I.     Abandonment of Claims**

We must first address Inojosa's failure to respond to any of CCC's arguments with respect to his Title VII claims for national origin discrimination (Count I), race discrimination (Count II), and retaliation (Count VI), as well as his failure to respond to any of CCC's arguments against his ADEA and Title VI claims (Counts III and IV, respectively). When a party raises arguments for summary judgment on various claims, the nonmoving party must respond to the movant's arguments as to each claim. *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). "Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims." *De v. City of Chi.*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012); *see also Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (a non-movant's failure to respond to arguments addressed in a summary judgment motion results in a waiver). As the sole focus of Inojosa's response brief is his gender discrimination claim[1], the Court considers the remaining claims abandoned. Counts I, II, III, IV, and VI are dismissed with prejudice.

---

[1] In fact, Inojosa begins his response brief by claiming "a reasonable jury could most clearly find from the facts that Defendant engaged in discrimination on the basis of sex." Dkt. # 67, at 1. Inojosa also concludes his response brief by stating, "As shown above, the evidence case would permit a reasonable fact finder to conclude that plaintiff's gender likely caused the complained-of adverse employment actions." *Id.* at 17.

9

## II. Count V: Gender Discrimination in Violation of Title VII

We now move on to the merits of the motion with respect to the remaining count, discrimination on the basis of sex in in violation of Title VII. Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C § 2000e–2(a). To survive CCC's motion for summary judgment, Injosa "must produce enough evidence for a reasonable factfinder to conclude" that Inojosa's sex caused an adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "The evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* In other words, we "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021).

We first consider whether Inojosa suffered an adverse employment action, for without an adverse employment action, Inojosa has no case. Adverse employment action "has been defined quite broadly in this circuit." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). The Seventh Circuit has recognized that it is "impossible" to create a "precise list of activities that constitute adverse employment actions," and whether an act is adverse depends on the "unique circumstances of individual cases." *Id.* Nevertheless, an adverse employment action must be "materially adverse, 'meaning

10

more than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (citing *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002)); *see also Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) ("not everything that makes an employee unhappy is an actionable adverse action"); *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (materially adverse employment action is one where the plaintiff suffers "a significant change in employment status."). Some examples of adverse employment actions include: termination or suspension, demotion evidenced by a decrease in wage or salary, denial of a raise or fringe benefits, less distinguishable title, material loss of benefits, significantly reduced material responsibilities, and unbearable changes in job conditions such as a hostile work environment. *Atanus*, 520 F.3d at 677; *see also Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (grouping adverse employment actions into three categories).

Here, Inojosa complains of multiple purported adverse employment actions. According to Inojosa:

> The question to be answered is this: whether denying Inojosa the opportunity to teach courses within his Department, repeatedly overriding his seniority, providing him with less desirable classes which result in last-minute cancellations that require him to scramble to other departments in order to meet his teaching load, with the accompanying stress that entailed (including medical and counselling expense), reducing his visibility on the Department website, as well as refusing to provide him with substitute pay, qualify as "something more than a minor or trivial inconvenience."

Dkt. # 67, at 14. We think not.

11

As the Seventh Circuit has pointed out, "if personal preference alone was sufficient to establish adverse employment action, the objective requirement for such a finding would effectively be eliminated and federal employment law would become a mechanism for enforcing employee preferences rather than remedying materially adverse treatment." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009); *see also Place v. Abbott Lab'ys*, 215 F.3d 803, 810 (7th Cir. 2000) (holding that "being shifted to an essentially equivalent job that [an employee] did not happen to like as much does not a Title VII claim create"); *Yan v. Bd. of Regents of the Univ. of Wisc. Sys.*, 2005 WL 2206768, at *14 (W.D. Wis. 2005) (a teacher who carried a higher teaching load than some of her coworkers has not suffered an adverse employment action when "the load was no different from what many other professors in the department had to carry."); *Bledsoe v. Potter*, 2005 WL 2230188, at *9–10 (N.D .Ill. 2005) ("[A] change in schedule, without more, does not constitute an adverse action under applicable precedent."); *Dass v. Chi. Bd. of Educ.,* 675 F.3d 1060, 1069–70 (7th Cir. 2012) (holding that assigning a teacher to teach seventh grade when she preferred to teach third grade is not an adverse employment action). Again, "not everything that makes an employee unhappy is an actionable adverse action." *Lewis*, 909 F.3d at 870.

Even if we were to deem any of the events described above to be materially adverse employment actions, Inojosa failed to present any evidence from which a reasonable jury could conclude that such actions were the result of gender discrimination. Inojosa claims the existence of a "pattern of gender favoritism," but

12

offers nothing but speculation as to the motives behind the various allegedly adverse employment actions. "[O]ur favor toward the nonmoving party on summary judgment 'does not extend to drawing inferences that are supported by only speculation or conjecture.'" *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1108 (7th Cir. 2012) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)); *see also Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) ("As we have noted before, if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (cleaned up).

Inojosa relies heavily on his own affidavit and answers to interrogatories rather than record evidence to support his allegations of CCC's discriminatory conduct. Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment. *Widmar v. Sun Chem. Corp.,* 772 F.3d 457, 459–60 (7th Cir. 2014). Such an affidavit, however, must meet the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). Personal knowledge can include reasonable inferences, but it does not include

speculating as to an employer's state of mind, or other intuitions, hunches, or rumors. *Widmar*, 772 F.3d at 460.

While there may have been some instances where seniority was not honored or where Inojosa was given less favorable class assignments, Inojosa presented no evidence from which a reasonable jury could conclude that such events were due to Inojosa's sex. Many of Inojosa's complaints, at their core, merely reflect his dissatisfaction with the way things are run at CCC. There is simply nothing in the record that would allow a reasonable jury to conclude that the events Inojosa complains of had anything to do with his sex.

Construing the facts and all reasonable inferences in his favor—as the Court is required to do at this procedural posture—Inojosa has not presented sufficient evidence creating a genuine issue of material fact for trial concerning his reverse sex discrimination claim. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017) (if the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted.") (quoting *Celotex*, 477 U.S. at 322). The Court therefore grants CCC's motion for summary judgment in regard to Inojosa's Title VII claim as alleged in Count V.

## CONCLUSION

For the foregoing reasons, the Court grants CCC's Motion for Summary Judgment [62]. Judgment is entered in favor of CCC on all counts. Civil case terminated.

It is so ordered.

Dated: September 30, 2022

_____
Charles P. Kocoras
United States District Judge
